IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

KLAHN V. KLAHN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

COLBY A. KLAHN, APPELLANT,

V.

ASHLEIGH B. KLAHN, APPELLEE.

Filed December 9, 2025.    No. A-25-071.

Appeal from the District Court for Hall County: PATRICK M. LEE, Judge. Affirmed in part, and in part vacated.

Jeffrey P. Ensz, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellant.

Erin M. Urbom, of Bradley Law Office, P.C., for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Colby A. Klahn appeals from the Hall County District Court's order modifying summer and telephone parenting time with the parties' child, as well as child support. As discussed below, we affirm the district court's modification of telephone time and child support, but we vacate the portion of the court's order that defined "summer" for purposes of the parties' parenting plan when neither party requested that modification.

## II. BACKGROUND

Colby and Ashleigh B. Klahn are the parents of Easton Klahn, born in 2016. The parties were divorced in August 2019. The divorce decree was not included in our record.

- 1 -

## 1. SEPTEMBER 2021 MODIFICATION

In September 2021, the parties entered into a "Settlement Agreement" and an attached "Parenting Plan Modification" to modify the 2019 decree. The parties agreed that they would "continue to share joint legal and physical custody of [Easton], with primary . . . placement of [Easton] with [Ashleigh] during the school year." Colby was to have parenting time every other weekend from Friday at 6 p.m. to Sunday at 6 p.m., and "any non-holiday school breaks that coincide with his weekend parenting time." Beginning in the summer of 2022, Colby was to have parenting time with Easton beginning the first full week after school let out for the summer until 1 week prior to the start of the school year; during the summer, Ashleigh was to have parenting time every other weekend from Friday at 6 p.m. to Sunday at 6 p.m., and she was allowed to have 1 week of parenting time in the middle of the summer. Whichever parent did not have Easton was to have telephone or FaceTime access to him every day between 7 p.m. and 8:30 p.m. for not less than 15 minutes. A holiday parenting time schedule was also established. Additionally, the parties agreed that Colby would pay child support in the amount of $200 per month; this was based on a "Worksheet 3 - Joint Physical Custody" calculation, which calculated Colby's obligation to be $219, but the parties agreed to a downward deviation "due to [Colby's] medical-related costs for insulin." The district court entered an order approving the settlement agreement and attached parenting plan, finding that it was in the child's best interests. The court also ordered Colby to pay $200 per month in child support, as determined by the Worksheet 3 calculation and agreed upon deviation.

In March 2022, Ashleigh filed a complaint to modify child support. However, in November she filed a motion to dismiss her complaint without prejudice, and the district court ordered the dismissal.

## 2. CURRENT MODIFICATION ACTION

On January 23, 2024, Ashleigh filed a complaint to modify child support and telephone time. She requested that Colby's child support obligation be increased "due to the following material and substantial change in circumstance": "[a]t least one or both of the parties have changed employment and have had a substantial increase in his [sic] income"; the change in employment and financial circumstances "resulted in at least a ten percent upward deviation, but not less than $25.00 of the current child support obligation"; and said change in financial circumstances had "lasted for three months and can reasonably be expected to last for an additional six months." Ashleigh also requested that Colby provide health insurance for their child, and that Colby's telephone time be modified to two or three times per week, instead of every night, "as it is not in the minor child's best interest[s]." Any answer filed by Colby does not appear in our record.

In December 2024, the parties mutually agreed to a parenting plan wherein they would have joint legal and physical custody of Easton. Easton would primarily reside with Ashleigh during the school year and with Colby during "the summer," and the nonprimary parent would have parenting time every other weekend from Friday at 6 p.m. to Sunday at 6 p.m. (we note that the parenting plan did not further define "the summer" as it had in the 2021 modification). A holiday parenting plan was also established. Telephone time remained "Unresolved." The parties' parenting plan was filed with the district court on December 26, 2024.

Trial was held on December 30, 2024. Counsel for both parties confirmed that the only two issues before the district court were telephone contact and child support. The parties were the only witnesses to testify.

*(i) Telephone Contact*

Easton was 8 years old at the time of trial. The 2021 modification allowed the parent not exercising parenting time to have telephone contact with Easton every day from 7 p.m. to 8:30 p.m. Ashleigh confirmed that the parties followed, or at least tried to follow, that plan. However, according to Ashleigh, the telephone contact led to disagreements between the parties and was the subject of "most" of their disagreements.

Text messages between the parties were received into evidence and show some of the conflict between them regarding telephone contact. During one exchange, Colby used an expletive and told Ashleigh not to hang up on him when he was talking to Easton; she responded that Easton said he would call Colby in the morning and did not to want to talk, so she had "every right to hang up." In another exchange, Ashleigh told Colby that Easton went to bed and fell asleep, so she would have him call Colby in the morning; Colby said to "[t]ry again" and he needed to show Easton something. When Ashleigh said that she did not need to "try again" because Easton was sleeping, and included a picture of the child in bed, Colby responded, "I'm sure you have saved photos." There was another exchange on a different date when Ashleigh told Colby, "I don't need to explain myself to you[,] I know when my child is sleeping and not sleeping." After Colby responded that Easton "needs to call in the morning then," Ashleigh noted that Easton had already talked to Colby earlier that day; a back-and-forth exchange followed about whether Colby was entitled to a second phone call in the same day.

According to Colby, Easton was asleep "[m]aybe once or twice" when Colby tried to call him. When asked how he reacted, Colby responded, "Angry because if a child is going to bed, then you should have him call that other parent," and "[t]hat is what I would do." He said he "might have" called Ashleigh names in text messages, and it was "[p]robably not" appropriate. According to Colby, the text messages received into evidence were "[d]efinitely, absolutely" outliers where there had been conflict.

Ashleigh believed that daily telephone contact was too much because "[i]t interferes when we're busy." When asked why she wanted the district court to reduce the telephone contact, she replied, "Because sometimes Easton doesn't want to talk all of the time, and it interferes with what we are doing, if we are on vacation or are busy that night"; "Easton is old enough now to be able to call his dad, if he asks to, just to pick up the tablet or my phone because he knows how to do that."

Colby testified that "[e]verybody is busy doing things." "[I]t's noted that I get 15 minutes a day to talk to Easton," and "[y]ou can make time in your day to have that." When asked if he felt that his time was more valuable than Ashleigh's time, Colby responded, "To me, yeah," "[i]t's my time." Colby confirmed that there were times when he indicated to Ashleigh that he needed to talk to Easton because he (Colby) would be at dinner later. When asked if it was more about his schedule than Easton's schedule at that point in time, Colby responded, "[Y]eah, if I am going to

do something and I call before I am doing such and my dinner takes me to after eight, I wouldn't be able to speak to him, so that's why I plan ahead, I guess."

Ashleigh was asked if Easton had any behaviors surrounding telephone contact. She replied, "[S]ometimes if he doesn't want to talk, he gets grumpy." According to Ashleigh, even if Colby had an entire weekend of parenting time until Sunday at 6 p.m., he would still call Easton that evening. "Sometimes [Easton] still doesn't want to talk. It's just the same thing over and over again conversation-wise."

During his testimony, Colby acknowledged that he still contacted Easton on Sunday evenings even if that had been his weekend of parenting time. "I do tell him good night, I love him, and ask him what he had for dinner," and "[t]hat's about it." When asked if he thought it was important to talk to Easton after he already spent an entire weekend with him, Colby responded, "I tell him I love him and good night," "[y]es, I do think it's very important for a child to hear that from his father or his mother if he was with me." According to Colby, when he had weekend parenting time, Ashleigh called Easton every night. If Ashleigh had Easton on Friday, "[s]he's currently not" calling him that Friday evening; "[s]he has stopped the last few times," "I'll assume just for this, for show."

Colby "[does not] set a timer for 15 minutes," and will "talk to [Easton] as long as he wants to talk to me on the phone." When asked if he ever got any indication that Easton did not want to talk to him on the telephone, Colby replied, "Sometimes it's short, and yes, then I keep the conversation short to get it over with so it is done and over, but, no, I don't drag out a conversation with him." "If he wants to talk, I will talk, just carry on a conversation," "I will talk to him and see how his day went, tell him I love him and good night."

Ashleigh wanted the district court to order telephone contact to occur "[a]t least a couple of days a week, and if Easton wants to call, he can." Easton had his own device at her house, along with Ashleigh's phone, that could be used to call Colby; she would not deny Easton the ability to call his father. When asked if she had any specific days that she wanted the court to order for telephone contact, Ashleigh responded, "If it's not his weekend, Mondays, Wednesdays, and Thursdays." And when asked about weekend telephone time, she said, "Maybe Sundays." Ashleigh believed that was what was in Easton's best interests.

Colby wanted to have telephone contact with Easton every day. He was "[a]bsolutely not" in agreement with having telephone contact on Tuesdays, Wednesdays, Thursdays, and once on the weekend. "Easton has told me that he enjoys talking to me at night and telling me that he loves me and good night, so I do not see how that would not benefit Easton," and "[t]hat shouldn't interfere with anything." It is "[a]bsolutely" important for Easton to have daily contact with both parents.

*(ii) Child Support*

Ashleigh also asked the district court to modify and increase child support from the current $200 per month.

Ashleigh had been employed by her current employer for "[p]robably six months" and earned $17 per hour; her paystub was received into evidence. She and Easton had vision and eye insurance through her work, but not health insurance as they were on Medicaid. Ashleigh did not contribute to retirement yet because she thought she had to be employed for a year.

- 4 -

Colby had been employed by his current employer for "about six months" and earned $20.25 per hour; his paystub was received into evidence. He did not contribute to retirement. He has diabetes and "[a]t times it can" impair his ability to work, but he had "good control now." When asked if he had to take time off for his diabetes in the last 6 months, Colby indicated that he had missed a couple days of work for "eye surgeries on both eyes." The monthly costs for his diabetes medication had not changed since the September 2021 modification. Colby used "[a]bout a bottle" of insulin each week, and each bottle was $30. He also needed an insulin pump and pump supplies, which he said cost "[a]round 1,000 to 1,200" a month, but he had not had to buy those under his current insurance plan yet because he had "leftover supplies"; "I don't have -- I am running a lot to get to the next month," "I will be out of my insulin pump, so I will have to reorder."

Ashleigh's proposed child support calculation was received into evidence. She used a "Worksheet 1 – Basic Income and Support Calculation" under which Colby's child support obligation would be $486 per month.

On cross-examination, Ashleigh explained that under the original decree the parties shared "50/50" custody, but that was no longer feasible when Easton reached school age because the parties did not live in the same town. The first modification was by agreement of the parties. When asked if she had agreed at that time to joint legal and physical custody with a parenting time schedule that had Easton primarily living with her, Ashleigh replied, "Yes." Colby's previous child support obligation was based on a joint physical custody calculation of $219, with a deviation to $200 due to his diabetes. On redirect, she was asked if she agreed to the deviation in order to get a parenting plan that she was happy with, and she replied, "Yes."

Ashleigh confirmed that she still agreed to joint legal and physical custody, Colby's parenting time with Easton had not changed, and Colby still had diabetes. However, she no longer agreed to a deviation for his diabetic condition "because he's perfectly capable of paying child support when he is constantly doing other stuff outside of working as well and buying all of these different things, etc."

(b) District Court's Order

In its order entered on January 2, 2025, the district court pointed out that the parties "agreed upon an updated Parenting Plan through mediation and stipulated to the Court issuing an order adopting this plan." The court found the stipulated parenting plan to be in the best interests of the child and adopted the December 2024 parenting plan. It stated that "[a]ll terms and conditions" of the prior parenting plan were superseded by the "attached Plan." However, the court noted that "[b]ased upon the agreed modifications of the parenting plan, two items are left undecided in the Parenting Plan which the Court must determine in order for the stipulated parenting plan to be functional: the definition of summer and telephone contact with the child." The court observed that in the parenting plan, "the parties have agreed to reverse the parenting time in the summer, however, no definition of summer is provided"; "[t]he Court therefore defines summer . . . as beginning on the last weekend of May and ending on the first weekend of August."

Next, the district court found that the text messages received into evidence illustrated that daily phone calls "caused unnecessary conflict in the co-parenting relationship," and the evidence established that the child had access to an electronic device at Ashleigh's home. The court "authorize[d] the non-custodial parent to have telephone or FaceTime parenting time with the child

on Mondays and Thursdays between 7:00 and 7:30 for a period of not less than fifteen minutes." Both parties were to remember that the provisions set forth in the order were the minimum requirements, and they "should be flexible in allowing the child to contact the other parent, especially when he has access to his own device."

The district court also modified Colby's child support obligation effective January 1, 2025. The court ordered him to pay $478 per month, which was calculated on a "Worksheet 1 - Basic Income and Support Calculation." Also, upon concluding that Colby's medical costs were not extraordinary and that a deviation was not in the child's best interests, the court denied Colby's request for a deviation. The court did, however, grant Colby an 80 percent abatement of his child support obligation for the months of June and July when Easton primarily resided with him.

Colby appeals.

### III. ASSIGNMENTS OF ERROR

Colby assigns, restated, that the trial court erred by (1) unilaterally changing the summer parenting time schedule the parties had agreed to prior to trial, (2) reducing telephone contact with Easton, and (3) modifying his child support obligation.

### IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id.*

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

### V. ANALYSIS

#### 1. SUMMER PARENTING TIME

In December 2024, the parties entered into and filed with the district court an agreed upon parenting plan wherein Easton would primarily reside with Ashleigh during the school year and with Colby during "the summer." Summer was not otherwise defined in the parenting plan. Colby claims the district court "overstepped its authority and abused its discretion" when it "*sua sponte*[,] imposed its own interpretation of 'summer,' effectively shortening the time [he] would have parenting time with Easton" by "adding language not agreed to by the parties." Brief for appellant at 14. In her appellate brief, Ashleigh did not address the district court's decision to define "summer."

At the onset of trial, counsel for both parties confirmed that the parties had filed a parenting plan that resolved "every issue," except for telephone contact and child support. The district court stated that it would "order the parenting plan as part of the modification" and would "do that in the final order." The definition of "summer" was not raised or otherwise addressed at trial through the parties' testimony or by arguments of their counsel. Accordingly, we find the district court

abused its discretion when it sua sponte defined "summer" for purposes of the parties' parenting plan, and we vacate that portion of the court's order.

## 2. TELEPHONE CONTACT

Colby contends that the district court abused its discretion when it reduced telephone contact with Easton.

Modifying a custody or parenting time order requires two steps of proof. *Mann v. Mann, supra*. First, the party seeking modification must show by a preponderance of the evidence a material change in circumstances that has occurred after the entry of the previous custody order and that affects the best interests of the child. *Id.* Second, the party seeking modification must prove that changing the child's custody or parenting time is in the child's best interests. *Id.*

Generally speaking, a material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree or prior modification, would have persuaded the court to decree differently. *Id.* The Nebraska Supreme Court has previously explained, "'Proof of a material change of circumstances is the threshold inquiry in a proceeding on a complaint to modify, . . . because issues determined in the prior custody order are deemed res judicata in the absence of proof of new facts and circumstances . . . .'" *Id.* at 928, 7 N.W.3d at 860 (ellipses in original).

Poor communication between the parents and a child's preference can constitute a material change of circumstances warranting a change in custody or parenting time. See *Sulzle v. Sulzle*, 318 Neb. 194, 14 N.W.3d 532 (2024).

In this case, the district court noted that the previous parenting plan provided for the noncustodial parent to have telephone or FaceTime access to the child every evening. However, the text messages received into evidence illustrated that daily phone calls caused unnecessary conflict in the coparenting relationship, and the evidence established that the child had access to an electronic device at Ashleigh's home from which he could initiate calls. The court determined that the "non-custodial parent" was authorized to have "telephone or FaceTime parenting time with the child on Mondays and Thursdays between 7:00 and 7:30 for a period of not less than fifteen minutes." Both parties were to remember that the provisions set forth in the order were the minimum requirements, and they "should be flexible in allowing the child to contact the other parent, especially when he has access to his own device."

Colby argues that the district court modified telephone contact "without noting any change of circumstance and without any evidence of the same having been presented." Brief of appellant at 13. He contends that the court "even limited telephone contact beyond what [Ashleigh] had requested." *Id.* Ashleigh responds that the district court did not err in modifying telephone time because it "took into account the best interests of the minor child" and "both parties indicated to the court that was an issue that was not able to be agreed upon in mediation." Brief for appellee at 9.

Although the district court did not specifically state that there had been a material change in circumstances regarding telephone contact since the September 2021 modification, such a finding was implicit in the court's January 2025 order. As noted by the court, the evidence presented at trial showed that the daily phone calls caused conflict between the parties. A review of the record reveals that there were arguments if Easton was asleep and missed a call with Colby,

if Colby wanted more than one call in a day or if he had already had parenting time that day, or if one of the parties had plans during the allotted time frame for the phone call. Additionally, there were times when Easton did not feel like talking on the phone. Based on our review of the record, a material change in circumstances regarding the daily telephone contact was proven by a preponderance of the evidence. And given Ashleigh's testimony that the telephone contact led to "most" of the parties' disagreements, it was a material change that affected the child's best interests.

Ashleigh wanted the district court to order telephone contact to occur "[a]t least a couple of days a week, and if Easton wants to call, he can." The court did authorize the "non-custodial" parent to have telephone or FaceTime contact with Easton 2 days each week; the parties were also supposed to be flexible in allowing Easton to contact the other parent. We note that the court's order regarding telephone contact applied equally to both parties, not just Colby. We find no abuse of discretion in the district court's modification of the parties' telephone parenting time.

### 3. CHILD SUPPORT

### (a) Use of Worksheet 1 Not Abuse of Discretion

Colby claims that the district court abused its discretion in modifying his child support obligation "using Worksheet 1, despite the fact that the parties continued to exercise joint physical custody and had previously relied on Worksheet 3 under the same parenting time schedule." Brief for appellant at 12. He argues that the "number of overnights and the parenting schedule remained unchanged." *Id*. While he acknowledges that the "court has discretion to use Worksheet 1 or 3 when an obligor's number of days falls between 109 and 142, the parties previously agreed to use Worksheet 3." *Id*. He argues that the district court "cited no changes of circumstances that would justify modifying from the previous use of Worksheet 3, nor was any evidence of a change of circumstances presented." *Id*.

Colby's argument would have us focus only on the fact that the parties previously stipulated to use Worksheet 3 when calculating child support. However, Ashleigh's complaint to modify child support was based on a change in the parties' employment and financial circumstances that would "result[] in at least a ten percent upward deviation, but not less than $25.00 of the current child support obligation," and said change in financial circumstances had "lasted for three months and can reasonably be expected to last for an additional six months." If proven, the noted change in financial circumstances can by itself constitute a material change in circumstances warranting modification of child support. See Neb. Ct. R. § 4-217 (rev. 2008) (rebuttable presumption of material change in circumstances when application of child support guidelines results in 10 percent or more variation, upward or downward, of current child support obligation, due to financial circumstances which have lasted 3 months and can reasonably be expected to last for additional 6 months).

Further, while Ashleigh acknowledged the use of Worksheet 3 in the parties' past modification, she did not agree that it was based on the allocation of parenting time. When asked by Colby's attorney if the prior child support calculation was based on the "number of days with each parent," Ashleigh responded, "Not really." She explained that Colby "wanted it to be smaller because of his diabetes or something like that." She agreed that the amount of parenting time for each parent was not changing and that they were still agreeing to joint legal and physical custody.

However, Ashleigh no longer wanted to have any deviation due to Colby's "diabetic condition" because "he's perfectly capable of paying child support when he is constantly doing other stuff outside of working as well and buying all of these different things, etc." Ashleigh confirmed on redirect examination that the previous agreed-upon deviation was not "due to the parenting time or the amount of days," but, rather, to get a parenting plan she "could live with." She therefore offered as an exhibit a child support calculation using a "Worksheet 1 – Basic Income and Support Calculation." Using the parties' current employment incomes in that exhibit, Colby's child support obligation would be $486 per month.

There was minimal testimony from Colby regarding child support. On this issue, he primarily testified about costs associated with his diabetes. His attorney, however, argued to the district court that legal and physical custody had not changed, and that Ashleigh's position on child support was "in bad faith." Further, if the court was going to "modify anything with regard to child support, to do so under a joint custody calculation." Colby's counsel appeared to acknowledge there may be at least a 10 percent change in child support based on changes in income.

In its order, the district court used the parties' current employment incomes in a "Worksheet 1 – Basic Income and Support Calculation" under which it calculated Colby's child support obligation to be $478 per month. (We note that when compared to Ashleigh's proposed calculation, there were slight differences in taxes and FICA, and no child tax credit.)

Colby does not take issue with the monthly incomes attributable to the parties or in the actual Worksheet 1 calculation. Rather, he claims that the district court should have used a Worksheet 3 joint custody calculation because "the parties continue to exercise joint physical custody and had previously relied on Worksheet 3 under the same parenting time schedule"; "Colby's parenting time did not change with the parties' new stipulation." Brief for appellant at 12.

On this issue, the district court's order stated,

> [Colby] is diabetic which has previously impaired his ability to work to some extent, however, he testified that he has his diabetes in "good control now[.]" No evidence was presented regarding excessive absences or impairments of his ability to work full-time hours. While both parties have sought modification of the previous child support obligation, [Colby] requests the Court continue to honor a stipulated deviation approved by a previous Court related to [his] diabetes. However, [he] provided only minimal evidence regarding the costs of his care. No evidence was presented that [Colby] suffers extraordinary symptoms, requires extraordinary treatments, or has extraordinary costs than others managing diabetes.
>
> . . . .
>
> While the mediated Parenting Plan provides for joint physical and legal custody, each party's parenting time does not exceed 142 days per year. By example, in reviewing 2025 it appears [Colby's] parenting time to be [sic] approximately 123 days [we note here that the 2021 worksheet attributed 109 days to Colby] placing a joint child support calculation at the discretion of the court. Other than June and July, the child spends the majority of each month at [Ashleigh's] home.

As indicated by the district court, it was within the court's discretion whether to use Worksheet 3. See Neb. Ct. R. § 4-212 (rev. 2011) (when specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is rebuttable presumption that support shall be calculated using worksheet 3; however, when one party's parenting time is 109 to 142 days per year, use of worksheet 3 to calculate support is at discretion of court). The court declined Colby's request to use Worksheet 3 based on the evidence presented and instead elected to modify Colby's child support obligation using Worksheet 1. We cannot say that this constitutes an abuse of discretion.

### (b) Deviation

Colby also argues that there was "no evidence of a material change in circumstances supporting the Court's removal of the downward deviation for [his] medical care costs." Brief for appellant at 13. He "continues to require diabetes medication, and the cost of that medication had not changed." *Id.*

The record reflects both parties requested that the district court review and modify child support, and that Colby wanted to continue receiving a deviation due to his diabetes. However, Ashleigh testified that she no longer agreed to a deviation because Colby was "perfectly capable of paying child support when he is constantly doing other stuff outside of working as well and buying all of these different things." As noted by the district court, Neb. Ct. R. § 4-203 (rev. 2020) allows for a deviation when there are extraordinary medical costs of either parent or child, but that the best interests of the child must also be considered. The court found that Colby's medical costs were not extraordinary, and his proposed deviation was not in the best interests of the child. Implicit in the court's decision is that there was a material change in circumstances warranting an increase in child support, and that any agreements or circumstances underlying the prior agreements between the parties no longer existed. Importantly, deviations from the child support guidelines must take into consideration the best interests of the child. See *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). Because a material change in circumstances supporting modification of child support was established under § 4-217, the determination of child support, including which worksheet to use and what deviations to apply, was subject to the child support guidelines and the discretion of the court. We cannot say that the court abused its discretion when it denied Colby any deviation from his child support obligation.

### VI. CONCLUSION

For the reasons stated above, we find that the district court abused its discretion when it, sua sponte, defined "summer" for purposes of the parties' parenting plan, and we vacate that portion of the court's order. However, we find no abuse of discretion in the district court's modification of the parties' telephone parenting time and child support.

AFFIRMED IN PART, AND IN PART VACATED.